UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JAMES C. BALLARD,

**Plaintiff,**

v.                  4:10-cv-54

KEEN TRANSPORT, INC., WILLIAM J. BROWN, and ZURICH AMERICAN INSURANCE COMPANY,

**Defendants.**

## ORDER

### I. BACKGROUND

Plaintiff James C. Ballard ("Ballard") sued Defendants Keen Transport, Inc. ("Keen"), William J. Brown ("Brown"), and Zurich American Insurance Company ("Zurich") (collectively "Defendants") for personal injuries he suffered when Brown drove his employer's, Keen's, tractor-trailer into the back of Ballard's farm tractor. *See* Doc. 1-1 at 3. The case is presently before the Court on Ballard's Motions to Exclude Opinion Testimony of Jimmy Lea ("Lea"), *see* Doc. 55, and Paul R. Jeffords, M.D. ("Jeffords"), *see* Doc. 56. The Court decides these motions after considering the parties' briefs, but without holding a *Daubert* hearing. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (noting that "Daubert hearings are not required").

### II. DAUBERT STANDARD

While Georgia law controls the substantive issues in this diversity case, federal law applies to this procedural question of admissibility. *See Long v. Raymond Corp.*, 245 F. App'x 912, 915 (11th Cir. 2007) ("the admissibility of expert testimony is a matter of federal, rather than state procedure"). "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

While this inquiry requires "an exacting analysis of the proffered expert's methodology, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence . . . . [A] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citations omitted).

Courts apply a three-prong test in judging the admissibility of expert opinion evidence:

> Admission is proper if (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1338 (11th Cir. 2003) (internal quotations omitted); *see also* FED. R. EVID. 702 (also requiring that testimony be based

on sufficient facts or data). The proponent of expert testimony must show that his expert meets this standard. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

### A. Qualifications

An expert may be qualified by knowledge, skill, experience, training, or education. *See* FED. R. EVID. 702. "Rule 702 does require that the area of the witness's competence matches the subject matter of the witness's testimony." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (internal quotations omitted); *see also Quiet Tech.*, 326 F.3d at 1345 (citing 8th Circuit *Daubert* precedent).

### B. Reliability

The Court must "scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." FED. R. EVID. 702 advisory committee's note (2000 amends.); *see also* FED. R. EVID. 702. To the extent possible, the Court will consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *See Quiet Tech.*, 326 F.3d at 1341 (citing *Daubert*, 509 U.S. at 593-94). This list is not intended to be exhaustive. *See Daubert*, 509 U.S. at 593 (1993). The Court has "considerable leeway" in deciding what other factors to apply. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The Court might also consider:

(1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.

(3) Whether the expert has adequately accounted for obvious alternative explanations.

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*See* FED. R. EVID. 702 advisory committee's note (2000 amends.) (citation omitted).

### C. Assisting the Trier of Fact

The expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" in order to be admitted. FED. R. EVID. 702. This "fit" requirement "goes primarily to relevance." *Daubert*, 509 U.S. at 591.

## III. JIMMY LEA

Defendants intend to call Lea to offer "general testimony about the potential long-

term effects of Plaintiff's extensive abuse of crystal methamphetamine." *See* Doc. 66.

### A. Qualifications

Lea is qualified to give his expert opinion in the field of toxicology. Lea is certified as a toxicological chemist by the National Registry of Clinical Chemistry. *See* Doc. 25 at 4. He holds a Bachelor of Science in Chemistry and a Master of Science in Toxicology. *See id.* Lea currently serves as the Scientific Director and Forensic Drug Lab Supervisor at the Medical College of Georgia. *See id.*

While Lea is not board certified or a member of either the Academy of Toxicological Sciences or the Society of Toxicology, *see* Doc. 25, he is unique in having an advanced degree in Toxicology because schools have only recently developed programs. *See* BERNARD D. GOLDSTEIN & MARY SUE HENIFIN, REFERENCE GUIDE ON TOXICOLOGY, IN REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 401, 415-16 (Fed. Judicial Ctr., 2d ed. 2000), available at http://www.fjc.gov/public/pdf.nsf/lookup/sciman08.pdf/$file/sciman08.pdf. Lea has also given seventeen lectures on toxicology subjects, *see* Doc. 25 at 7-9, and has been hired as an expert at least thirteen times, *see* Doc. 47 at 19:2-17 (Lea Dep.).

Lea's proffered testimony also matches his competence. *See Robinson*, 447 F.3d at 1100. Toxicology is "the study of the adverse effects of chemicals on living organisms." GOLDSTEIN & HENIFIN, *supra* at 403. Toxicology can help explain the hazards that "a chemical or physical agent present[s] to human populations," and the risk "associated with chemical exposure at any given dose." *Id.*

### B. Reliability

"[O]ne may be considered an expert but still offer unreliable testimony." *Quiet Tech.*, 326 F.3d at 1342. Lea's Federal Rule of Civil Procedure 26(a)(2) Report is a two paragraph statement of "scientific facts" followed by a list of three references. *See* Doc. 25 at 2-3.

> Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough. The party offering the expert must present the witness' proposed testimony in a form that persuades the trial court that the testimony will in fact assist the trier of fact. As we have held previously, carrying this burden requires more than "the *ipse dixit* of the expert."

*Cook ex. rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (quoting *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998). Defendants have failed to satisfy this burden.

Toxicologists develop their opinions by "thorough review of research literature and treatises concerning effects of exposure to the chemical at issue. . . . [T]he expert assesses the strengths and weaknesses of the research studies." *See* GOLDSTEIN & HENIFIN, *supra* at 415. "Toxicological research usually involves exposing laboratory animals (*in vivo* research) or cells or tissues (*in vitro* research) to chemicals,

3

monitoring the outcomes (such as cellular abnormalities, tissue damage, organ toxicity, or tumor formation), and comparing the outcomes with those for unexposed control groups." *Id.* at 405.

Each different research method involves different criteria for evaluating the research's reliability. *See id.* at 406-10. For example, while an animal study's reliability depends on similarities between human and animal responses, *see id.* at 409, the reliability of an *in vitro* experiment depends on whether it is predictive of *in vivo* experiment outcomes. *See id.* at 410.

Here, Lea did not explain the research methods on which he relies. *See* Doc. 25. Without this information, the Court cannot apply appropriately tailor factors to test the research method's reliability. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Lea lists three sources in his expert report. *See* Doc. 25 at 3 (citing METHAMPHETAMINE ABUSE AND ADDICTION, NIDA RESEARCH REPORT SERIES, No. 06-4210 (2006); NIDA RESEARCH MONOGRAPH SERIES: METHAMPHETAMINE ABUSE: EPIDEMIOLOGIC ISSUES AND IMPLICATIONS, No. 151 (1991); RANDALL C. BASELT, DISPOSITION OF TOXIC DRUGS AND CHEMICALS IN MAN (7th ed. 2004)).

The National Institute of Drug Abuse ("NIDA") report on which Lea relies is nothing more than "an *overview* of the latest scientific findings on methamphetamine." *See* INTRODUCTORY LETTER FROM DIRECTOR NORA D. VOLKOW, M.D. (emphasis added), available at http:// www.fjc.gov/public/ pdf.nsf/lookup/sciman08.pdf/$file/sciman08.pdf. The monograph is made up of nine chapters written by different authors covering very different topics ranging from "Trends and Patterns of Methamphetamine Smoking in Hawaii" to "Neurotoxicity of Methamphetamine." *See id.* In his report, Lea made no effort to cite any specific chapter, page, or line on which he bases his conclusions. *See* Doc. 25 at 3. Lea also did not specify which of the Baselt text's 1,230 pages he relied on. *See id.*

Additionally, Lea failed to assess the strengths and weaknesses of any research. *See* Doc. 25; GOLDSTEIN & HENIFIN, *supra* at 415. Lea developed his opinion for this litigation. *See* FED. R. EVID. 702 advisory committee's note (2000 amends.) (citation omitted) (discounting opinions developed "expressly for purposes of testifying."). Lea's lack of citation makes it appear that he is not being as careful in his litigation consulting as he is in his ordinary professional work. *See Kumho Tire*, 526 U.S. at 152 (requiring expert to display equal rigor in court testimony and professional practice).

Because Lea's testimony fails to satisfy the reliability prong of the *Daubert* test, there is no need for the Court to rule on whether his testimony would assist the trier of fact in understanding the issues in the case.

Ballard's Motion to Exclude Opinion Testimony of Jimmy Lea, *see* Doc. 55, is ***GRANTED***.

## IV. PAUL JEFFORDS, M.D.

Defendants offer Jeffords to testify that he did "not see any evidence of acute injury

to the spine that would account for a significant increase in back pain," *see* Doc. 23 at 2. In his deposition, Jeffords clarified that he meant that he "saw no fracture . . . no acute disc injury, no tear of the disc, no herniation of the disc." *See* Doc. 50 at 50:5-13 (Jeffords Dep.). Jeffords also seeks to testify that Ballard had increasingly severe degenerative changes in his discs predating the collision. *See* Doc. 23 at 2. Defendants assert that Jeffords can also opine more generally that "there is no *objective* reason for Plaintiff's *subjective* complaint that the accident aggravated his well-documented chronic back pain." *See* Doc. 67 at 5.

### A. Qualifications

Jeffords is qualified to give these opinions. He is a board-certified and fellowship-trained orthopedic spine surgeon. *See* Doc. 23 at 2. He has published articles on spine surgery and other medical topics and regularly gives presentations on the spine. *See id.* at 4-7.

### B. Reliability

Ballard faults Jeffords for never examining him and failing to read either Ballard's or his treating physicians' depositions. *See* Doc. 56-1 at 17. Jeffords admits that he would never diagnose a patient in his ordinary professional work without a personal examination. *See* Doc. 50 at 22:5-18. (Jeffords Dep.); *see also Kumho Tire*, 526 U.S. at 152 (requiring expert to display equal rigor in court testimony and professional practice).

In *Baker v. Smith and Nephew Richards, Inc.*, the Court excluded an expert for failing to examine the patient or review any depositions where the treating physician's testimony conflicted with the expert's theory. 1999 WL 1129650, at *4-5 (N.D. Ga. Sept. 30, 1999). Likewise, Jeffords's broad opinion, that there is no objective reason for Ballard's pain, conflicted with Ballard's expert's testimony. Ballard's expert testified that significant trauma could cause the body to release inflammatory chemicals that could cause Ballard pain. *See* Doc. 52 at 9:12-20 (Herrington Dep.).

Jeffords also failed to consider blunt force injury to Ballard's muscle tissue. His failure to account for these obvious alternative explanations weighs against the admissibility of Jeffords's testimony. *See* FED. R. EVID. 702 advisory committee's note (2000 amends.) (factoring in whether expert accounted for obvious alternatives).

Jeffords also developed his opinion expressly for this litigation. *See* Doc. 23; FED. R. EVID. 702 advisory committee's note (2000 amends.) (discounting opinions developed "expressly for purposes of testifying."). His independence is further called into question by his five appearances as an expert for Defendants' counsel within the last twelve months. *See* Doc. 50 at 9:8-18 (Jeffords Dep.); *see also Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1362 (M.D. Ga. 2009) (noting that ongoing consulting relationship between counsel and doctor calls into question independence of medical opinion).

Jeffords may not testify that "there is no *objective* reason for Plaintiff's *subjective* complaint that the accident aggravated his well-documented chronic back pain." *See* Doc. 67 at 5.

5

Jeffords's narrower opinions are more reliable. Jeffords's methodology consisted of reviewing Ballard's medical records and radiology images from before and after the collision to look for degeneration, fracture, tear, or herniation of a disc. *See* Doc. 23 at 3; Doc. 50 at 50:5-13 (Jeffords Dep.). This is an area where surgeons, like Jeffords, have experience and are known to reach reliable results. *See* FED. R. EVID. 702 advisory committee's note (2000 amends.) (considering whether area of expertise is one "known to reach reliable results for the type of opinion the expert would give."). Jeffords did "not see any evidence of acute injury to the spine that would account for a significant increase in back pain." *See* Doc. 23 at 2. He did see degenerative changes that "progressively increase[d] in severity on the x-rays from [July 30, 2005, September 25, 2006, and November 25, 2008]." *Id.* These opinions are confined to applying Jeffords's expertise to what he saw in the medical records, rather than speculating that Ballard has no other injuries from the collision.

### C. Fit

Jeffords's narrow opinions are helpful to the jury. Ballard alleges that the collision with Brown caused him great pain and suffering in his back. However, Ballard also suffered from lower back pain before the collision with Brown. *See* Doc. 58 at 57:9-58:4 (Ballard Dep.). Ballard's pain stretched back more than thirty years to a hyperextension of his lower back in the 1970s. *See id.* at 12:3-4, 42:13-18. Jeffords also believes that Ballard's disc degeneration is unrelated to the collision. *See* Doc. 23 at 2. Therefore, Jeffords's testimony could help the jury sort out which physical injuries are traceable to Ballard's medical history rather than the collision.

Jeffords's two narrow opinions are based on sufficient facts and data. *See* FED. R. EVID. 702. Jeffords reviewed a stack of Ballard's medical records "about two feet tall," *see* Doc. 50 at 12:23-16:6 (Jeffords Dep.); including numerous x-rays and MRIs, *see* 25:16-23, and symptom descriptions from Ballard, *see* Doc. 24:10-14. *See also* Doc. 23 at 2.

Jeffords may testify that: (1) he did not see any evidence of fracture, tear, or herniation of Ballard's discs that would account for a significant increase in back pain; and (2) Ballard's lumbar spine x-rays show degenerative changes of the T12-L1 and L1-L2 discs that progressively increased in severity between 2005 and 2008. *See* Doc. 23 at 2. Ballard's Motion to Exclude Opinion Testimony of Paul R. Jeffords, M.D., *see* Doc. 56, is **GRANTED** in part and **DENIED** in part.

### V. CONCLUSION

Ballard's Motion to Exclude Opinion Testimony of Jimmy Lea, *see* Doc. 55, is **GRANTED**. Ballard's Motion to Exclude Opinion Testimony of Paul R. Jeffords, M.D., *see* Doc. 56, is **GRANTED** in part and **DENIED** in part.

This 3rd day of February 2011.

/s/ B. Avant Edenfield

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA